COY v. TITLE GUARANTEE & TRUST CO. et al. (McMAHON, Intervener).

(District Court, D. Oregon. July 8, 1912.)

No. 3,209.

1. RECEIVERS (§ 83*)—POWERS.

A receiver is but an arm of the court to take care of and administer the property, assets, and estate in suit, to do with it as the law may direct for the benefit of the parties concerned; and, while in theory he can do nothing without the court's order or sanction, he has, in matters of management and manner of disposition of the estate, a large discretion.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 153; Dec. Dig. § 83.*

For other definitions, see Words and Phrases, vol. 7, pp. 5993–5997; vol. 8, pp. 7780, 7781.]

2. RECEIVERS (§ 90*)—POWERS—CONTRACTS.

A receiver cannot impair any valid contract subsisting when he was appointed under which rights and obligations have become fixed, but generally he is not bound by covenants of leases and executory contracts, and, subject to control by the court, he may abandon or repudiate them if in his opinion it would not be profitable or desirable to adopt and perform them.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 164–166; Dec. Dig. § 90.*]

3. LANDLORD AND TENANT (§ 112*)—ASSIGNMENT OF LEASE—ASSENT BY LANDLORD—WAIVER.

A landlord waives right to forfeit a lease for its assignment without his assent in writing, as required by the lease, by receiving rent from the assignee.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 343–349; Dec. Dig. § 112.*]

4. LANDLORD AND TENANT (§ 86*)—LEASES—OPTION TO RENEW.

Where a lease gave the tenant, a married woman, an option to renew for a fixed term, notice of her election to renew was not insufficient because signed by her husband where he acted as her manager, and the notice showed that she was the lessee.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 270–275; Dec. Dig. § 86.*

**5. LANDLORD AND TENANT (§ 86\*)—LEASES—OPTION TO RENEW—NOTICE OF ELECTION—SUFFICIENCY.**

Under a lease providing that the lessee should have the privilege of a renewal for a five-year period to be exercised by giving written notice to the receiver at least three months before expiration of the term, etc., a letter to the landlord's receiver, written by the lessee's husband, stating that, in accordance with such provision which he designated by paragraph and page number, he, as manager, applied for renewal of the lease, though informal, was sufficient notice.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 270–275; Dec. Dig. § 86.\*]

**6. LANDLORD AND TENANT (§ 101\*)—LEASE—TERMINATION—GROUNDS—DAMAGE TO BUILDING.**

That use of the basement of a building for bathhouse purposes for which it was rented caused damage to the building was insufficient cause for termination of the lease by the landlord, since the landlord is presumed to have foreseen the natural consequences to the building of such use, it appearing that the lessee attempted as far as possible to prevent the injury.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 314, 315; Dec. Dig. § 101.\*]

**7. RECEIVERS (§ 90\*)—LEASES—REFUSAL OF RENEWAL—PROPRIETY.**

Though a lease gives the tenant a right to renewal for additional five-year period, the lessor's receiver is justified in refusing to grant the renewal, where it appears that it would be detrimental to the estate through injury to the building and through hindering a sale.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 164–166; Dec. Dig. § 90.\*]

**8. RECEIVERS (§ 90\*)—EXECUTORY CONTRACTS—ABROGATION—DAMAGES—LIABILITY.**

The general rule that a receiver in electing to abrogate an executory contract of the person or corporation of whose estate he is put in charge without rendering the estate liable to damages does not apply to refusal to renew a lease of premises for bathhouse, etc., purposes, where it appears that the tenant has incurred large expense in fitting up the premises in reliance upon his right to elect to renew, and where a part of the improvements were made without any notice or intimation by the receiver that he intended to refuse the renewal.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 164–166; Dec. Dig. § 90.\*]

**9. LANDLORD AND TENANT (§ 83\*)—EXECUTORY CONTRACT TO RENEW LEASE—ABROGATION—DAMAGES—MEASURE.**

Where a lessor's receiver abrogates an executory contract to renew a lease, the measure of any damages recoverable by the tenant against the estate is not liquidated damages stipulated in the lease to be paid on election of one of the parties to terminate the lease, since the receiver's authority to abrogate the lease arises independently of it; the proper measure being ascertained by considering the tenant's outlay for putting the premises in condition for occupancy, the time of occupancy lost to the tenant, and the expense attending an early change to other premises.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 263, 264, 266–269, 278, 295; Dec. Dig. § 83.\*]

In Equity. Bill by N. Coy against the Title Guarantee & Trust Company and others; Myrtle McMahon intervening. Decree for intervener.

See, also, 157 Fed. 794.

---

C. H. Labbe and Malarkey, Seabrook & Stott, all of Portland, Or., for intervener.

William C. Bristol, of Portland, Or., for receiver.

WOLVERTON, District Judge.   The facts out of which this controversy arises are, in brief, as follows:

A receiver was appointed in this court for the Title Guarantee & Trust Company on November 6, 1907. R. S. Howard, Jr., succeeded to the receivership January 21, 1908, and has since been and is now the duly qualified and acting receiver of all the property and effects of such company. The receivership carried with it certain subsidiary corporations, of which the Commercial Trust Company is one. After Howard's appointment as receiver, he became the president of the Commercial Trust Company, and has since acted in that capacity. He has, however, treated the property of the company as an asset of the Title Guarantee & Trust Company, and is proceeding to administer it in his capacity as receiver. A long time previous to the receivership, to wit, on October 12, 1905, the Commercial Trust Company executed a lease to one J. F. King to certain space in the basement of the building belonging to that company for the purposes of a bathhouse, barber shop, and bootblack stand for the term of five years beginning December 1, 1905, and ending November 30, 1910, at a monthly rental of $75. The terms of the lease are, among other things, that the lessor doth lease and demise to the lessee the premises described, "together with a reasonable supply of steam heat, at such hours as the same can be conveniently delivered from the boilers of said company without additional cost or expense or interference with operation of the other portions of said building, or of the machinery therein; and reasonable supply of gas for lighting purposes only. Also such a supply of water from the well of said lessor on said premises as can be conveniently given by said lessor, as it shall determine, and not otherwise." It is covenanted by the lessee:

"That he will not suffer or commit any strip or waste of said premises, nor make, or suffer to be made, any alterations or additions to or upon the same; that he will place no signs upon the exterior of said building; that he will not assign this lease without the consent of the lessor, or those having its estate in the premises, having been first obtained in writing allowing the same."

And it is further stipulated:

"That the lessee shall have the privilege of renewing this lease for the period of five years, from the 30th day of November, 1910, upon such terms and conditions as may be agreed upon hereafter, which privilege shall be exercised by giving written notice to the lessor at least three months prior to the expiration of the term of this lease; provided, however, that no greater rental shall be demanded than is charged for like premises in the same vicinity. Provided always, and these presents are upon this condition, that the said lessor or the said lessee, or the successors or assigns of the said lessor, or the heirs, executor or assigns of the said lessee, may at any time cancel this lease on ninety days written notice of such cancellation, which said notice shall be given by the party desiring to cancel this lease to the other party thereto, and all right or interest of the said lessee to the said premises under or on account of said lease or occupation of the premises shall be determined and extinguished at the end of ninety days from such notice, it

being understood and agreed that at the expiration of said period of notice the said lessee shall peaceably and quietly deliver up said premises, in all respects as hereinbefore provided, and in such case the party giving such notice and desiring to cancel this lease shall pay to the other party thereto the sum of $1,500 as liquidated damages."

On August 28, 1906, King assigned the lease to C. H. Reynolds, to which assignment the Commercial Trust Company assented, through John E. Aitchison, its president. On December 31, 1906, the Commercial Trust Company and Reynolds, in modification of the original lease, entered into an agreement as follows:

"The lessor agrees to pump out the swimming pool located in leased premises once each week if same does not interfere with operation of building, and if requested so to do by lessee if the lessor at the time requested has sufficient water in its own well for the purpose. The lessee has to give aid and assistance required by lessor in such pumping, and to furnish steam for purpose of heating water when it can do so without interfering with operation of building. The lessor agrees to furnish steam for heating and bath purposes, and water for shower baths and tub baths only for such time on Sundays as the lessee may at lessee's expense arrange with the engineer of the building as is now being done; provided, however, that said water shall be furnished only at lessor's convenience and without additional expense to it being occasioned thereby. The rental reserved to be paid during the said term, commencing with December 1, 1906, shall be ninety ($90.00) dollars per month payable on the first day of each and every month from and after December 1, 1906."

On the same day Reynolds assigned an undivided one-half interest in the lease to Mrs. Myrtle McMahon, the Commercial Trust Company assenting thereto through C. B. Aitchison, secretary. On June 28, 1907, Reynolds and wife assigned, by an instrument denominated a bill of sale, the remaining one-half interest in the lease to Mrs. Myrtle McMahon. This was not formally assented to by the Commercial Trust Company. Notwithstanding the want of assent, the assignee continued to pay the monthly rental of $90 as stipulated by the modification agreement, which was accepted by the Commercial Trust Company prior to the appointment of the receiver, and since by the receiver himself. On August 4, 1910, M. H. McMahon addressed a letter to "R. S. Howard, Jr., Receiver Commercial Trust Co.," as follows:

"Dear Sir: I desire to call your attention to the fact that the first five-year period of the 10-year lease entered into by and between your company and J. F. King on the 12th day of October, 1905. covering that portion of the basement now used as a bathhouse at 240 Washington St., and under which lease my wife is now the lessee, will expire on the 30th day of November, 1910.

"In accordance, therefore, with the provisions of said lease, and of paragraph number two on page number three therein, as manager, I hereby make application for a renewal of said lease for the remaining five years from the 30th day of November, 1910.

"I will thank you for an early reply in the premises, as I desire to know how to proceed as to future plans for improvements, etc., as per our conversation on the 2nd inst."

On September 1, 1910, Howard wrote Mrs. McMahon:

"Dear Madam: Referring to lease dated October 12th, 1905, between the Commercial Trust Company and J. F. King to basement in Commercial Build-

ing, this city, and assignment of said lease by J. F. King to C. H. Reynolds dated August 28, 1906, and a subsequent assignment of an undivided half interest in said lease by C. H. Reynolds to you under date of December 31, 1906. The undersigned declines to renew the lease upon the ground that you have failed to observe the terms and conditions of your lease and have so operated the premises leased you that the building has been damaged, and is continually being damaged, and the undersigned will not recognize any right in you to an extension.

"Further, no notice has been given of the desire for an extension in the manner contemplated by the terms of the lease, and within the time provided.

"Yours truly, Commercial Trust Company,
"By R. S. Howard, Jr., President."

On the same day Mrs. McMahon served another notice on Howard to the effect that she desired and intended to exercise the privilege of renewing the lease for the period of five years.

At the expiration of the five-year term of the lease Howard, receiver of the Title Guarantee and Trust Company, caused the steam heat and water supply to the lessee to be entirely discontinued, and declined longer to recognize the lease. Whereupon Mrs. McMahon petitioned the court, by intervention in the main case of Coy v. Title Guarantee & Trust Co., praying an order and decree to the effect that the lease had been legally renewed for the term of five years, and requiring the Commercial Trust Company to perform the covenants thereof. By order of the court the petitioner was allowed to continue in the possession and use of the premises on condition that she pay to the clerk of the court the rental, to wit, $90 per month, during the pendency of the controversy. Since that time the receiver, in construing the lease and the modification thereof, has furnished steam and lights for the baths of petitioner from 8 o'clock a. m. until 8:30 p. m. during week days, but none on Sundays and holidays, as had been done previously.

Much testimony has been taken, and the matter has been continued from time to time until the present. The theory upon which the petition was interposed and the intervention sought was and is that the petitioner was entitled as a matter of legal right to have the lease renewed for a second period of five years by reason of stipulation contained in the lease providing for such renewal. The receiver controverts the theory, and urges, that, a receiver having been appointed for the property and assets of the Commercial Trust Company, such receiver thenceforth was not bound as was the lessor for the performance of the terms of the lease, the contract being executory, but that it was incumbent upon him to subserve the best interest of the estate and all concerned, including the creditors. In other words, he insists that as receiver he was not bound, even though the lease so stipulated, to assent to its renewal, or to permit it to be renewed, if the new arrangement would prove burdensome to the estate, and an incumbrance in winding out the business pertaining thereto. As previously indicated, the Commercial Trust Company is a concern merely subsidiary to the Title Guarantee and Trust Company, and its property and assets were taken over by the receiver, upon his appointment by the

court, along with the property and assets of the latter company, so that both are being administered together under one receivership.

[1, 2] A receiver is but an arm of the court to take care of and administer the property, assets, and estate over which the court has assumed control for the time being, to do with it as the law may direct for the benefit of the parties concerned. In theory he can do nothing without the court's order or sanction. He nevertheless exercises, in matters of management and manner of disposition of the estate, a large discretion, which he needs must do, as the court cannot attend to details of administration. The court will act, and the receiver will exercise his discretion, at all times to best subserve the estate and those concerned in its due administration. The receiver may not impair, by any act on his part, any valid contract, subsisting at the time of his appointment, which fixes the obligations and determines the rights of the respective parties, but as a general rule, which is said to be well established, he is not bound by the covenants of leases and executory contracts of those over whose property he is appointed, and, subject to the control of the court, he may abandon or repudiate them if, in his opinion, it would not be profitable or desirable to adopt and perform them. 34 Cyc. 258, 259.

It was said by the Court of Appeals, 5th Circuit, in General Electric Co. v. Whitney, 74 Fed. 664, 667, 20 C. C. A. 674, 677, that:

"It was the duty of the receivers to use all reasonable efforts to carry out and perform the beneficial contract, and it was also their duty to refuse to adopt an executory contract which they found would prove so burdensome as to imperil the fund."

To the same purpose is United States Trust Co. v. Wabash Railway, 150 U. S. 287, 299, 14 Sup. Ct. 86, 90 (37 L. Ed. 1085); the court saying:

"The general rule applicable to this class of cases is undisputed that an assignee or receiver is not bound to adopt the contracts, accept the leases, or otherwise step into the shoes of his assignor, if in his opinion it would be unprofitable or undesirable to do so; and he is entitled to a reasonable time to elect whether to adopt or repudiate such contracts."

See, also, Sunflower Oil Co. v. Wilson, 142 U. S. 313, 12 Sup. Ct. 235, 35 L. Ed. 1025; Empire Distilling Co. v. McNulta, 77 Fed. 700, 23 C. C. A. 415; Central Trust Co. v. East Tennessee Land Co. et al. (C. C.) 79 Fed. 19; Ellis v. Boston, Hartford & Erie Railroad Co., 107 Mass. 1; Commonwealth v. Franklin Insurance Co., 115 Mass. 278; Wells v. Hartford Manilla Co., 76 Conn. 27, 55 Atl. 599; Scott v. Rainier Power & Railway Co., 13 Wash. 108, 42 Pac. 531.

[3] Some question has been made as to whether the lease has not been forfeited because the assignment of one half-interest therein by C. H. Reynolds to Myrtle McMahon was not assented to by the Commercial Trust Company in writing. The assignment is called a bill of sale, but nevertheless contains words of transfer and assignment of Reynolds' remaining one-half interest in the lease. It bears date June 28, 1907. The rent was regularly paid from that time on as before, and received by the Commercial Trust Company until the date

of the receivership, and subsequently by the receivers. I say this because it must be assumed, being the regular course in which the business was transacted, and there is no testimony to the contrary. In fact, it is not disputed that it was so paid. Such a course on the part of the lessor and its receivers was a recognition of the new relationship, and a waiver of express assent in writing to the assignment. Another irregularity is noted in the manner by which the Commercial Trust Company gave its assent to a previous assignment, the assent appearing to have been executed by C. B. Aitchison, secretary; it not having been shown that C. B. Aitchison was ever secretary of the company, but that John E. Aitchison was. The assignment was made December 31, 1906, and after so long a time I think it cannot be that the manner of executing such assent is fatal to the validity of the lease.

[4] It is urged with greater emphasis that the notice attempted to be given by Mrs. McMahon of her desire to renew the lease for another period of five years was insufficient for the purpose designed. It is stipulated that the privilege of renewal shall be exercised by giving written notice to the lessor at least three months prior to the expiration of the term of the lease. No particular form of notice is required, and no specific time is fixed in which the notice shall be served. The notice was by letter bearing date August 4, 1910, which must have been received by the receiver in due course. His stamp of the time it was received bears date August 3d, so either he or the writer made a mistake in the date. The principal objection to the notice is that it is signed by M. H. McMahon. McMahon, however, was the manager for his wife, and the notice shows that his wife was the lessee—that is, the owner of the term—and, of course, the person entitled to the renewal, if any one.

[5] I think the informality of the notice does not render it ineffectual or nugatory, and it must be held to be a sufficient notice of Mrs. McMahon's desire to exercise her privilege of renewal. No reply was made to the notice until September 1st, when the receiver wrote Mrs. McMahon declining to renew the lease, or to recognize any right on her part for an extension, upon the ground that she had failed to observe the conditions thereof, and had so operated the leased premises as to damage the building, and on the further ground that no notice had been given of her desire for an extension in the manner contemplated by the terms of the lease. Thereupon Mrs. McMahon served upon the receiver a more formal notice in the exercise of her privilege to renew. This notice, however, was too late, as it was not given three months prior to the expiration of the term, which was November 30, 1910. But, the former notice being sufficient, this latter notice was unnecessary.

[6] Nor was the damage which was being done to the building, although great, a sufficient cause for terminating the lease. When the Commercial Trust Company leased the premises for the purposes designated, it must be presumed to have anticipated the natural consequences to the building which would result from the stipulated use,

and, whether injury proved to be great or small, it could not afford justification for abrogation of the lease. The stipulation in the lease is that the lessee "will not suffer or commit any strip or waste of said premises," and it might be implied that he would not do any unnecessary damage to the building. In this regard the evidence satisfactorily shows that, when Mrs. McMahon's attention was called to the damage which her occupancy was doing to the building, she took immediate steps to prevent, as far as possible, the continuance of the injury. She tried faithfully, but was unable to succeed effectually. The grounds assigned, therefore, by the receiver in reply to Mrs. McMahon's notice requesting the exercise of her privilege of renewal were not sufficient upon which to abrogate the lease or to refuse the renewal.

[7] But it is now insisted that the renewal should be denied and the lease abrogated because it has proven burdensome and greatly detrimental to the estate in the hands of the receiver, and will so continue as long as the present occupancy continues. It has been abundantly shown that the occupancy under the lease has resulted, by reason of the escape of steam and moisture from the bath or steamroom, as it is called, in great injury or damage to the building in which the baths are located, and especially to the rooms immediately above the baths. Other floors yet above are threatened with injury from the same source, and, if allowed to continue, many of the office rooms in the building will be rendered unfit for occupancy. And it is the opinion of experienced architects that the fault cannot be relieved against except through a large outlay in reconstructing the walls and ceiling of the baths. This renders but one reasonable verdict possible, when the best interest of the estate is consulted, which is that the occupancy of the premises for the purposes specified in the lease should be discontinued. It is highly cumbersome and burdensome to the estate, and, further, a renewal of the lease might extend the term far beyond the time for closing the receivership, and undoubtedly it would prove a hindrance to a sale and disposition of the building and property incumbered by it. The action of the receiver in declining to renew the lease is justified by the attending conditions, and should be approved. This renders it unnecessary to construe the terms of the lease as it relates to the time and manner of supplying steam and water for the lessee's use.

[8] It is next to be considered whether Mrs. McMahon is entitled to damages on account of the receiver's refusal to renew the lease according to the stipulations thereof, and, if so, what amount should be awarded her. The receiver, in making his election to abrogate the executory contracts of the person or corporation of whose estate he is put in charge, does so without subjecting the estate required for the satisfaction of existing claims of creditors to a charge for damages. Wells v. Hartford Manilla Co., supra; Scott v. Rainier Power & Railway Co., supra; Central Trust Co. v. East Tennessee Land Co., supra; Fidelity Safe-Deposit & Trust Co. v. Armstrong (C. C.) 35 Fed. 567. Such appears to be the rule, although the action of the receiver

may entail a cause of action against the person or corporation whose estate he is administering as receiver. Chemical National Bank v. Hartford Deposit Co., 161 U. S. 1, 16 Sup. Ct. 439, 40 L. Ed. 595. This is the general rule, but it cannot be said to be absolutely applicable in every case where the receiver abrogates an executory contract. In Wells v. Hartford Manilla Co., supra, a well-considered case, the court says:

"We do not, however, wish to be understood as saying that there may not be frequent cases where the act of a receiver in not adopting an executory contract would entail such injury upon the other party to the contract, by reason of what he had already done under it, and relying upon the faith that it would be carried out, that a claim against the estate would, upon the principles of equity and good conscience which underlie receivership proceedings, be recognized and allowed."

In the case at bar the original lessee King, when he took the lease, was at the expense of some $2,300 or $2,400 to fit the premises for his use and purposes, and recently the present owner of the lease has been at considerable expense in receiling the steamroom, to prevent, if possible, the further escape of steam and moisture, to the detriment of the building. All this, we may assume, was in reliance upon the faithful observance of all the terms of the lease on the part of the lessor and its successors in interest. Of course, this anticipated a renewal if it should be desired and requested, and it may be that these improvements would not have been made except in anticipation that the lessee and his assigns would ultimately have the use for the full term of 10 years. When the ceiling was improved, Mrs. McMahon must be considered to have known that the receiver could terminate the lease if he found it burdensome to the estate, or refuse to renew it upon the same ground. The improvement was made, however, on the complaint of the receiver, and without notice or intimation on his part that he intended to abrogate the lease or refuse to permit the extension, and Mrs. McMahon endeavored, in the utmost good faith and by her best efforts, to check the continuance of damage to the building. Under such conditions, I think it inequitable and unjust that the petitioner should be turned away practically remediless. That she will have suffered damage by the refusal to renew the lease is without question. If she is relegated to an action against the Commercial Trust Company, and is required to depend upon that company surviving the receivership with a surplus, her relief is fanciful, and would probably prove illusory.

[9] The measure of her damages is not the liquidated damages stipulated for in the lease in case one party or the other desired to terminate it, because the lease is not being abrogated in pursuance of its terms, but by the receiver by virtue of his authority wholly aside from any stipulated conditions. The measure should rather be by consideration of the outlay of Mrs. McMahon and assignors for putting the premises in condition for occupancy as contemplated by the lease, the outlay incurred in the endeavor to prevent further injury to the main building from escaping steam and moisture, the time

of occupancy, or rather the time to be lost to the occupant, and the expense attending an early change to other premises.

I am impressed, therefore, that $1,000 will be a fair measure of damages in favor of the petitioner, and that amount will be allowed her from the funds in the hands of the clerk of this court; the balance to be paid to the receiver. The petitioner will vacate the premises at the end of the time for which rent has been deposited with the clerk.